**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

EPHA FASON,

                                     CASE NO. 16-11070

        *Plaintiff*,             DISTRICT NANCY G. EDMUNDS
*v.*                            MAGISTRATE JUDGE PATRICIA T. MORRIS

COMMISSIONER OF SOCIAL SECURITY,

        *Defendant*.

_____/

### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (Docs. 20, 21)

**I.**    **RECOMMENDATION**

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Fason is not disabled. Accordingly, **IT IS RECOMMENDED** that Fason's Motion for Summary Judgment (Doc. 20) be **DENIED**, that the Commissioner's Motion for Summary Judgment (Doc. 21) be **GRANTED**, and that this case be **AFFIRMED**.

**II.**    **REPORT**

    **A.**    **Introduction and Procedural History**

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned magistrate judge for the purpose of reviewing a final decision by the Commissioner of Social Security ("Commissioner") denying Plaintiff's claim for a period of disability and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("the Act"), 42 U.S.C. § 401 *et seq.*

(Doc. 3; Tr. 1-4). The matter is currently before the Court on cross-motions for summary judgment. (Docs. 20, 21).

Plaintiff Epha Fason was thirty-six years old as of September 14, 2015, the date of the ALJ's decision. (Tr. 21, 121). The Commissioner denied her claim. (Tr. 79). Fason then requested a hearing before an Administrative Law Judge ("ALJ"), which occurred on July 9, 2015, before ALJ Joy Turner. (Tr. 26-68). Fason testified at the hearing without the aid of counsel; Vocational Expert ("VE") Harry Cynowa also testified. (*Id*.). On September 14, 2015, the ALJ found Fason not disabled. (Tr. 12-21). On January 27, 2016, the Appeals Council denied review. (Tr. 1-4). Fason filed for judicial review of that final decision on March 23, 2016. (Doc. 1).

### B.    Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal citations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).

2

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id*. at 286 (internal citations omitted).

## C.     Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . .

3

physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three:   If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

4

**D.     ALJ Findings**

Following the five-step sequential analysis, the ALJ found Fason not disabled under the Act. (Tr. 20). The ALJ found at Step One that Fason had not engaged in substantial gainful activity following the alleged onset date, May April 10, 2014. (Tr. 14). At Step Two, the ALJ concluded that Fason had the following severe impairments: "migraine; essential hypertension; cardiac dysrhythmias." (*Id*.). At Step Three, the ALJ found that Fason's combination of impairments did not meet or equal one of the listed impairments. (*Id*.). The ALJ then found that Fason had the residual functional capacity ("RFC") to perform work at the light level of exertion, with additional limitations as follows:

> [T]he claimant could occasionally climb ramps and stairs, ladders, ropes, and scaffolds; she could frequently balance, stoop, kneel, crouch, and crawl; the claimant would need to avoid hazardous machinery and heights; limited to simple, routine tasks, with no interaction with the public occasional interaction with coworkers and supervisors.

(Tr. 15-19). At Step Four, the ALJ found that Fason could not perform any past relevant work. (Tr. 19). At Step Five, the ALJ concluded that Fason retained the ability to perform work which exists in significant numbers in the national economy. (Tr. 19-20).

**E.     Administrative Record**

**1.     Degree of Review in Non-Briefed Social Security Cases**

Fason is proceeding *pro se* in this matter; while she submits a brief in support of her motion for summary judgment, she states few, if any, cognizable legal arguments. Fason's failure to provide substantial argument in support of her case raises the question

of whether her motion should merely be evaluated on its merits, or whether the Court should apply some heightened degree of review.

Some judges in this district have found that a "plaintiff in a Social Security disability benefits case . . . has no burden to do anything in order to obtain judicial review of the administrative decision except file a timely complaint." *Wright v. Comm'r of Soc. Sec.*, No. 09-CV-15014, 2010 WL 5420990, at *1 (E.D. Mich. Dec. 27, 2010). *Wright* looked to 42 U.S.C. § 405(g), which provides that "[t]he court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remand." *Id.* at *2. Citing a Northern District of Ohio decision issued in 1983, *Wright* concluded that "[o]nce the complaint and a copy of the record are filed, the Court has before it all that is necessary to enter a judgment on the merits." *Id.* (citing *Kenney v. Heckler*, 577 F. Supp. 214 (N.D. Ohio 1983)).

Yet *Wright* did not establish whether courts ought to apply a circumscribed form of review. Courts must liberally construe arguments raised by *pro se* litigants, but "[l]iberal construction does not require a court to conjure allegations on a litigant's behalf." *Erwin v. Edwards*, 22 F. App'x 579, 580 (6th Cir. 2001); *see also Wells v. Brown*, 891 F.2d 591, 594 (6th Cir. 1989) ("Neither [the Supreme] Court nor other courts . . . have been willing to abrogate basic pleading essentials in *pro se* suits.").

It would be entirely inappropriate for the Court to provide the same level of analysis to Social Security benefits claimants who provide substantial briefs in support of

6

their claims and those who do not. That practice would turn the adversarial judicial system on its head, converting the courts into an advocate for claimants and opponent to the Commissioner, thereby compromising the Court's role as impartial adjudicator. Moreover, such a practice would undermine the important role played by Social Security benefits attorneys, who discover meritorious claims for remand and present them to the courts. Granting exhaustive review to non-briefed claims for remand would also vitiate the waiver principle, which provides that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *Anthony v. Astrue*, 266 F. App'x 451, 458 (6th Cir. 2008) (quoting *United States v. Elder*, 90 F.3d 1110, 1118 (6th Cir. 1996)); *Moody v. Astrue*, No. 2:10-CV-0084, 2011 WL 335863, at *1 (S.D. Ohio Jan. 31, 2011) ("[T]he failure to file a brief at all is a waiver of any issue which might require reversal of the administrative decision.").

Providing exhaustive review to non-briefed claims would also create a perverse incentive for Social Security claimants to abstain from arguing in support of their claim. It would prove difficult for disability advocates to compete with a free court-as-advocate service given that a judge knows best what sort of arguments he or she finds most persuasive. Should the knowledge of this practice become widespread, Social Security benefits appeals would become increasingly taxing on the courts.

The Sixth Circuit has not opined on the degree of review to be accorded to non-briefed or poorly briefed benefits claims, but there is precedent for reversing the Commissioner's decisions where they are grossly deficient, even where the claimant fails

to raise the issue prompting remand. *See Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011) ("Admittedly, Reynolds did not raise this specific objection to the decision below, and generally arguments not raised are abandoned. However, this rule is prudential and not jurisdictional . . . and the requirement for specific objections may be excused in the interest of justice.") (quotation omitted); *Carson v. Barnhart*, 140 F. App'x 29, 39 (10th Cir. 2005) ("Ordinarily, we will not consider an argument raised for the first time on appeal . . . . This rule is not without exceptions, however, and in unusual circumstances we will exercise our discretion to consider an argument not raised in the district court . . . . The argument Mr. Carson raises is purely a legal one, and its resolution is clear."); *Truesdale v. Colvin*, No. CIV-12-1307-HE, 2014 WL 549377, at *4 (W.D. Okla. Feb. 11, 2014) (remanding "in the interests of justice" based on an argument that the claimant did not raise).

Some judges in this district have concluded that review of a non-briefed benefits claim should be limited to identifying "obvious errors" in the Commissioner's decision. *See Crist v. Comm'r of Soc. Sec.*, No. 13-CV-14008, 2014 WL 2931412, at *2 (E.D. Mich. June 27, 2014) (Michelson, J.). The Commissioner's failure to obtain an expert medical opinion on whether the claimant's physical impairments equal a listed impairment has frequently been found to constitute an obvious error requiring remand. *See id.*; *Ostrander v. Comm'r of Soc. Sec.*, No. 14-13151, 2016 WL 2754906, at *3 (E.D. Mich. Apr. 5, 2016); *Brown v. Comm'r of Soc. Sec.*, No. 12-14057, 2014 WL 222760, at *13 (E.D. Mich. Jan. 21, 2014). One decision suggested that an error is "obvious" when it

8

is "impossible to determine whether substantial evidence supports the ALJ's analysis without th[at] analysis," thus "a Plaintiff cannot waive . . . by not raising" an argument relating to the ALJ's failure to determine whether the claimant met a listing. *Beden v. Comm'r of Soc. Sec.*, No. 214CV14727MAGPTM, 2015 WL 5965006, at *12 (E.D. Mich. Sept. 18, 2015) report and recommendation adopted, No. CV14-CV-14727, 2015 WL 5936324 (E.D. Mich. Oct. 13, 2015).

The precise method for reviewing non-briefed Social Security appeals remains to be determined by the Sixth Circuit, but for the time being the "obvious error" standard provides sufficient guidance to review the instant matter.

### 2.    Medical Evidence

My recitation of the medical evidence focuses on the findings of physicians rather than Fason's subjective complaints. Fason's medical troubles began in April 2014, when she was admitted to the emergency room due to high blood pressure. (Tr. 224). She visited the emergency ward several times over the following weeks, complaining of headaches, blurred vision, palpitations, dizziness, nausea, and shortness of breath. (Tr. 205-208, 249-251, 302-314, 317-21, 399-400, 410). A benign cyst was noted on the midline of Fason's neck. (Tr. 222). A CT scan showed a cyst at the sternal notch. (Tr. 314). A later MRI scan showed a cystic structure on the pituitary gland. (Tr. 357).

During her April 24, 2014, emergency room visit, Fason was noted to have slightly diminished sensation on the left side of her face. (Tr. 324). Strength was limited on the left side, but with questionable effort. (*Id.*). In July 2014 Fason treated with Dr.

9

Amanda Nies, who noted reduced strength in the upper left arm, but with poor effort; "psychosomatic influence" was noted as a potential cause of her ailments. (Tr. 439). Fason was in a wheelchair during that visit. (Tr. 437).

In May 2014 Fason was admitted to the hospital with nausea and diarrhea. (Tr. 410).

In July 2014 state agency physician Dr. Muhammed Ahmed concluded that Fason's ailments did not meet a listing, that she could lift up to twenty pounds occasionally, ten pounds frequently, and could sit for six hours in a workday, and stand for six hours in each workday. (Tr. 74-75). She could occasionally climb; could frequently balance, stoop, kneel, crouch, and crawl; and should avoid concentrated exposure to hazards. (Tr. 75-76).

In August 2014 Dr. Michael Feldman wrote that Fason suffered from chronic diarrhea and weight loss, was non-ambulatory, and required assistance with numerous activities of daily living. (Tr. 422).

In September 2014 Fason sought treatment from Dr. Mohammed Ghaffaraloo, who referred Fason to a neurosurgeon pursuant to discovery of a pituitary mass. (Tr. 429).

In October 2014 Dr. Nies noted allegations of weakness on the left side, including alleged falling. (Tr. 444). She found that Fason's strength was reduced on the left side, but with poor effort. (Tr. 446-47). Psychosomatic influence was again noted. (Tr. 447).

10

In November 2014 Fason's pituitary tumor was noted to be "benign" and not warranting "any further imaging followup or workup." (Tr. 485).

In January 2015 Fason told Dr. Nies that she experienced constant numbness and weakness on the left side; she had not pursued physical therapy as recommended. (Tr. 449). Weakness on the left side was noted, but with poor effort, and possible psychosomatic influence. (Tr. 451-52).

In late January 2015 Fason treated with Dr. Daniel Menkes, who noted full strength and tone in all extremities. (Tr. 457). Dr. Menkes noted "[v]ariable effort on the left although [Fason] can raise her left limbs against gravity." (*Id*.).

In March 2015 Dr. Andrew Dohery noted, pursuant to ovarian cyst removal, that Fason was independent with activities of daily living. (Tr. 589). In April 2015 Dr. Estela Mogrovejo stated that Fason had not started her prescribed regimen of prednisone, was independent with activities of daily living, and could lift her limbs against gravity. (Tr. 597-600). Also in March 2015 Fason treated with Dr. Geoffrey Prysak for an ovarian cyst causing pain; Dr. Prysak noted that Fason was "vague with descriptions" of her pain, that she "refused . . . to speak louder" when asked, could not recall her medication names or dosages, would not "provide where she gets her prescriptions," was not "forthcoming with details," and could not "state why she didn't call her PCP" before visiting the hospital. (Tr. 540).

11

In April 2015 Dr. Palaniappan Manickam found that Fason's diarrhea was controlled and that she performed her with activities of daily living independently. (Tr. 603-07).

In May 2015 Fason presented to Dr. Steward Robertson, who noted "normal" extremities, but also noted weakness. (Tr. 611). He noted that diarrhea and migraines were adequately controlled. (Tr. 612).

In August 2015 Fason was evaluated by Dr. Essam Montasir, who described her medical history as involving "basically symptomatic treatment and mainly treating the migraines" resulting from Fason's pituitary tumor, along with "severe gastroenteritis" along with "severe diarrhea." (Tr. 620). Fason asserted that she could not stand or do "any activities" due to "severe weakness and the tumor in the head;" she arrived at the appointment in a wheelchair with a cane. (*Id*.). Dr. Montasir noted that the "etiology of" Fason's use of a wheelchair was "not clear." (*Id*.). Dr. Montasir asked that Fason stand and walk "with her cane or without," but Fason instead "stood up and then landed on another chair, claiming that she is unable to walk or stand and this was unusual as there was no muscle atrophy or joint deformities or edema, cyanosis or clubbing." (Tr. 621). He noted that Fason's reflexes, muscle tone, and sensation were all "normal, so could not explain this but she reported that she cannot get up from the floor." (*Id*.). Dr. Montasir issued an opinion on Fason's ability to perform work activities including walking and lifting, but wrote that he was unable to assess most of Fason's functions because she was unwilling to cooperate with the required testing. (Tr. 623-28).

12

### 3.   Application Reports and Administrative Hearing

### a.   Fason's Function Report

Fason completed a function report on May 28, 2014, in which she asserted that she is unable to work because she is "unable to sit up for long periods of time," because she has "limited use of [her] left side," could walk "very little with a walker + cane to bathroom only," because she has blurred or doubled vision, along with severe headaches, and because she needed assistance with performing several personal care activities. (Tr. 169).

Fason's average day consisted of watching television, taking medication, and sleeping on the couch. (Tr. 170). She lived with her juvenile son, but was unable to take care of him. (*Id*.). Her mother assisted by performing chores around the house. (*Id*.). Fason woke up in pain "all through the night." (*Id*.). She required assistance getting dressed, combing and washing her hair, eating, and using the toilet. (*Id*.). Fason did not cook because of difficulty standing and weakness in her left hand. (Tr. 171). As to the housework she performed, she wrote "none," but also wrote that she needed assistance in regard to "washing, cooking, someone to cut the grass." (*Id*.). She also scribbled the words "don't understand questions" next to this entry. (*Id*.).

Fason went to church once weekly; she could not drive, and was unable to go out alone due to balance issues and left side weakness. (Tr. 172). She did not go shopping, because she "can't[,] have no money." (*Id*.). Fason's hobbies once included reading, sewing, cooking, volleyball, and walking, but she could no longer perform them due to

13

her ailments. (Tr. 173). Fason's social activities were limited to attending church, phone calls, and visiting the doctor. (*Id*.).

Fason checked boxes indicating that she suffered limitation to every area of function listed with the exception of talking and getting along with others. (Tr. 174). She wrote that she could walk "about . . . ten steps," and could continue walking again after a five minute rest. (*Id*.). She had difficulty understanding instructions. (*Id*.). She required a walker and cane, but did not tick a box indicating that she needed a wheelchair. (Tr. 175). As to medication side effects, Fason noted that she experienced dizziness, drowsiness, and headaches. (Tr. 176). In the remarks section she wrote about further issues with headaches, diarrhea, and vomiting. (*Id*.).

### b.    Fason's Testimony at the Administrative Hearing

At the July 9, 2015, hearing before the ALJ, Fason appeared without an attorney or other representative. (Tr. 26-69). After being told of her right to obtain a representative, Fason opted to proceed without counsel. (Tr. 29). The ALJ explained that Fason was eligible for disability benefits only if she was impaired for twelve months or more in a manner that prevented her from completing gainful activity. (Tr. 34).

Fason testified that she stood five foot four, and weighed 200 pounds; she previously weighed around 265 pounds. (Tr. 36-37). She lost weight unintentionally as the result of diarrhea and lack of appetite. (Tr. 37). She was licensed to drive, but was unable to do so. (Tr. 38-39). Fason asserted that she graduated from art school. (Tr. 39-40).

14

Fason previously worked as an office assistant, involving sketching homes, watching over other workers, and lifting up to sixty pounds. (Tr. 43-46). Fason asserted that she could no longer work because of weakness on her left side, because her "eyesight is not that good," because she had difficulty sitting in one place for a long time, and because she experienced "pain all the time." (Tr. 46). Fason asserted that she was informed by physicians that "complicated migraines" were "causing most of the problem." (Tr. 47). Occipital nerve blocks "masked" her ailments but "didn't keep them away." (Tr. 47-48). Physical therapy to remedy her ailments did not help. (Tr. 48).

Fason asserted that she was told to use a wheelchair, cane, and walker by physicians at Beaumont hospital sometime in April "of last year." (Tr. 49). The ALJ asked whether Fason had been told that her ailments may be partly psychosomatic, and that she should see a psychiatrist; she denied. (Tr. 50-51).

Fason asserted that she was taking Norco, Motrin, and Neurontin for pain, along with Topamax, Norvasc, Immodium, and Hydrochlorothiazide, which treated high blood pressure, diarrhea, migraines, and acid reflux. (Tr. 51-53).

Fason asserted that her pain ranged from seven to eight out of ten despite use of medication. (Tr. 54). Without medication, the pain "can be like a 10." (*Id.*). Her migraines produced pain that was "like a 10." (*Id.*).

As to her eye health, Fason asserted that she suffered from keratoconus, which limited her vision, and that she was scheduled for an ultrasound to further diagnose the problem. (Tr. 56-57).

15

Fason asserted that she could lift "nothing" on her left side, and perhaps three pounds on the right side. (Tr. 57). She was unable to lift a gallon of milk. (*Id*.). She could sit for roughly one hour and walk for "a couple minutes." (*Id*.). She required assistance to "clean [her]self and everything." (Tr. 58). She watched television during the day; she did not prepare meals. (Tr. 58-59). She was unable to sleep in her bed, and so slept on the couch. (Tr. 59). She was however unable to rise from the couch on her own, and required help to get to the bathroom, but only sometimes required "help bathing." (Tr. 59-60). She received help from her nephew and son for most of her waking hours. (Tr. 62). She had difficulty sleeping. (Tr. 63). She did not perform any chores. (*Id*.).

### c.       The VE's Testimony at the Administrative Hearing

The ALJ then called upon the services of a VE to determine Fason's ability to perform work. (Tr. 63). The ALJ and VE inquired about Fason's past relevant work, but because the ALJ did not base her decision on Fason's ability to return to past work, this discussion is irrelevant to the current appeal. (Tr. 63-65). The ALJ then asked the VE to assume a hypothetical individual who could perform light work, "except she could occasionally climb ramps and stairs, ladders, ropes, and scaffolds. She could frequently balance, stoop, knee[l], crouch, and crawl. She would need to avoid hazardous machinery and heights." (Tr. 65). The VE found that such a worker could perform work available in substantial numbers in the national economy, including work as a hand packager (250,000 jobs nationally), small products assembler (250,000 jobs),  and visual-inspector checker (220,000 jobs). (Tr. 66).

16

In a second hypothetical the ALJ asked the VE to assume an individual limited to "simple, routine tasks with no interaction with the public, [and] occasional interaction with coworkers and supervisors." (Tr. 66). The VE found that the same jobs identified in the first hypothetical would be available. (*Id.*).

In a third hypothetical, the ALJ asked the VE to keep the same parameters as the second hypothetical, but limited the worker to sedentary labor. (Tr. 66). The VE found that the jobs of bench hand (200,000 jobs nationally), final assembler (more than 200,000 jobs nationally), and security monitor (greater than 120,000 jobs) would be available. (Tr. 67).

In a fourth hypothetical, the ALJ asked whether a worker with the "same [limitations] as all hypotheticals," but who lacked "the persistence, pace, or concentration to perform simple routine tasks" on a full time basis, and who would be "off-task 20 percent of the time or more due to impairments," and absent from work "three or more days a month" would be able to perform work. (Tr. 67). As expected, the VE found that these limitations would be work-preclusive. (*Id.*).

Fason did not ask any questions of the VE. (Tr. 68).

**F.      Governing Law**

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into various categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or

certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2. Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* at *2. When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* at 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). *See also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to

18

"other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-3p, 2006 WL 2329939, at *2.

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). *See also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2). *See also Caldwell v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (1996). *See also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec. of Health & Human Servs*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273, 1995 WL 138930, at *1 (6th Cir. 1995) (unpublished table decision).

An ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, No. 09-5773, 2011 WL 180789, at *4 (6th Cir. Jan. 19, 2011) (citing *Caldwell v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001)); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2. The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. §

20

404.1529; SSR 96-7p, 1996 WL 374186, at *2; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2.

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quotation omitted), a claimant's description of his or her physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1. Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(i)   [D]aily activities;
(ii)  The location, duration, frequency, and intensity of . . . pain;
(iii) Precipitating and aggravating factors;
(iv)  The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
(v)   Treatment, other than medication, . . . received for relief of . . . pain;
(vi)  Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). *See also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3. Furthermore, the claimant's work history and the consistency of his or her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5.

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A). *See also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all credible limitations developed prior to Step Five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

## G.    Analysis

### i.    The Decision is Free From Obvious Errors

As noted above, Fason's brief in support of her motion for summary judgment does not appear to state any cognizable legal arguments. The Court will nevertheless interpret her assertions liberally, addressing both her apparent arguments and determining whether any obvious errors are present in the record. I begin by addressing the question of obvious error.

Courts applying the "obvious error" standard have frequently remanded for further proceedings where the ALJ failed to render a proper finding at Step Three. *See, e.g.*, *Crist*, No. 13-CV-14008, 2014 WL 2931412, at *2; *Ostrander*, No. 14-13151, 2016 WL 2754906, at *3; *Brown*, No. 12-14057, 2014 WL 222760, at *13. At Step Three, the ALJ

22

must determine whether the claimant meets or equals an impairment in the Listing of Impairments, 20 C.F.R. Part 404, Subpart B, Appendix 1. The ALJ may determine whether the claimant meets a listing without seeking input from a medical expert, but must seek an expert opinion when determining whether a claimant's conditions medically equal a listed impairment. *See Retka v. Comm'r of Soc. Sec.*, 1995 WL 697215, at *2 (6th Cir. Nov. 22, 1995) ("Generally, the opinion of a medical expert is required before a determination of medical equivalence is made.") (citing 20 C.F.R. § 416.926(b)); *Krawczak v. Comm'r of Soc. Sec.*, No. 14-11281, 2016 WL 1178753, at *4 (E.D. Mich. Feb. 26, 2016) ("SSR 96–6p treats equivalence determinations differently from determinations as to whether an impairment meets a listing, requiring expert evidence for the former, but not the latter."), report and recommendation adopted, No. 14-11281, 2016 WL 1170778 (E.D. Mich. Mar. 25, 2016). "This expert opinion requirement can be satisfied by a signature on the Disability Determination Transmittal Form." *Osley v. Comm'r of Soc. Sec.*, No. 12-12279, 2013 WL 3456963, at *10 (E.D. Mich. July 9, 2013).

The Disability Determination Explanation in this case, dated July 15, 2014, bears the signature of Dr. Muhammad Ahmed. (Tr. 77). Dr. Ahmed specifically considered whether Fason met or equaled Listings 4.04 (ischemic heart disease), 4.05 (recurrent arrhythmias), or 11.03 (minor motor seizures). (Tr. 74). He concluded that Fason did not, and instead found that she retained ability to perform light work, and was thus not

disabled. (Tr. 75-76, 78). Remand is thus not appropriate as to the ALJ's Step Three finding.

> ### ii.     The ALJ's RFC Adequately Accounts for Fason's Supportable Limitations

Having reviewed the most common area of remand in non-briefed cases, I now turn to an overview of the remaining portions of the ALJ's decision. Based on the medical record, the ALJ determined that Fason could perform light work with additional restrictions, which is to say:

> [T]he claimant could occasionally climb ramps and stairs, ladders, ropes, and scaffolds; she could frequently balance, stoop, kneel, crouch, and crawl; the claimant would need to avoid hazardous machinery and heights; limited to simple, routine tasks, with no interaction with the public occasional interaction with coworkers and supervisors.

(Tr. 15-19). This RFC finding properly accommodates Fason's physical and mental limitations as supported by the medical record. Fason primarily complains in her brief that the ALJ understated the effects of her "weakness, pain and visual disturbances" and of her diarrhea, and that she was a "very high fall risk." (Doc. 20 at 3).

Fason alleges that on August 18, 2015, physical therapist Kara Miller noted that she was a "very high fall risk." (Tr. 635). Review of that record does not reveal any mention of Fason's risk of falling, though it does note that she complained of generalized muscle weakness, dizziness, and anemia, which could arguably contribute to a risk of falling. (Tr. 635). In any case, her risk of falling appears to result from her alleged left-side weakness, which limited her ability to walk. Upon review of Fason's testimony and

24

the medical records, we have on one side Fason's fairly consistent assertion that she was either unable to walk or had great difficulty walking. (Tr. 437, 444, 449, 494, 596, 620).

On the other side we have physicians who consistently doubted that Fason was being wholly truthful about her alleged left-side weakness, and who cited good evidence in support of that conclusion. Dr. Nies noted that Fason had normal muscle bulk and tone, and suggested that Fason was not giving physical strength tests her full effort. (Tr. 439-40, 446-47, 451,52). Dr. Mogrovejo noted that Fason could lift her extremities against gravity. (Tr. 597). Perhaps most tellingly, Dr. Montasir concluded that Fason was being intentionally uncooperative with testing, and appeared to theatricalize her weakness, falling down in a dramatic fashion. (Tr. 620). This was particularly unusual, as Dr. Montasir noted normal muscle tone and reflexes, and did not note any cyanosis, clubbing, or edema which could explain this extreme weakness. (Tr. 621). Fason's total inability to walk, even with the aid of a cane, is particularly unusual given that she asserted that she made use of both a cane and walker, suggesting that she retained at least some ability to walk with support. (Tr. 49, 175). Furthermore, Dr. Nies repeatedly suggested that Fason's alleged weakness was at least partly the result of psychosomatic influence, suggesting that her limitations were self-imposed rather than physical. (Tr. 440, 447, 452). Several physicians also noted that Fason was independent with activities of daily living, contrary to her suggestion that she could not rise from the couch or visit the toilet without assistance. (Tr. 592, 600, 607).

25

Fason challenges that "[t]he disabilities the Defendant stated the Plaintiff stated in her report are not all accurate;" she asserts that she cannot even "lift a glass of water" due to her left side weakness and that she is unable to "sit in on position for a long period of time." (Doc. 22 at 1-2). Fason also asserts that she "fell on the floor from trying to walk without any assistance" when being evaluated by Dr. Montasir, that he "didn't want to help the Plaintiff off the floor until Plaintiff asked for family and then Dr. Monastir [sic] helped Plaintiff back to her wheelchair." (*Id*. at 3). She also reports that Dr. Khaddam "asked Plaintiff to walk to him and Plaintiff fell on the floor. Plaintiff's mother was upset because Dr Khaddam saw Plaintiff falling and didn't try to catch her. Plaintiff has never been uncooperative when doctors asked her to follow some instructions." (*Id*.). Finally, she asserts that "[d]octors that stated the Plaintiff did her own daily living activities didn't ask they just assume." (*Id*.). In essence, Fason asks the Court to believe that multiple physicians in the record treated her in an unfair and improper fashion, rendered findings based on supposition rather than investigation, and concluded that she was exaggerating her ailments without reason. There is no evidence in the record to support the existence of a conspiracy between numerous physicians, both employed by the Commissioner and in private practice, to deny Fason benefits. It is yet more difficult to believe that numerous physicians independently decided to treat Fason in an unfair manner. The far more reasonable explanation is the one reached by the ALJ: that Fason's reports of left-side weakness are significantly exaggerated, as supported by numerous notes from physicians

in the record. (Tr. 19). The ALJ did not err in crediting these consistent physician findings over Fason's unsupported subjective reports.

In any case, even assuming that Fason was somehow unfortunate enough to repeatedly meet paths with biased, unfair, unreasonable, or unprofessional physicians, she should have sought out further treatment. It is incumbent upon Fason, who bears the burden of proof at Step One through Step Four of the sequential evaluation process, *see Van Der Maas v. Comm'r of Soc. Sec.*, 198 F. App'x 521, 525 (6th Cir. 2006), to prove that she is disabled. She has failed to submit medical records corroborating her asserted level of disability allegedly resulting from left-side weakness. Substantial evidence supports the ALJ's decision to rely upon the consistent findings of physicians in the record suggesting that Fason's left-side weakness was exaggerated, psychosomatic, and otherwise not as severe as Fason alleges.

### iii.    Fason's Physical Therapy Records Do Not Alter the Outcome of This Case

Fason also asserts that the Commissioner erred when the Appeals Council concluded that certain physical therapy records dated September 30, 2015, could not be reviewed because they were produced following the ALJ's decision. (Doc. 20 at 2). She asserts that she was receiving treatment at the same facility and for the same ailments in August 2015, thus the evidence should have been considered. (*Id.*). In her response brief, Fason clarifies that she was referring to records from the "the Physical Therapy Neuro HC," which was dated August 13, 2015, and is referred to as exhibit 20F in the record.

(Doc. 22 at 4). The Appeals Council asserted that record 20F could not be considered in this case because "[t]he [ALJ] decided your case through September 14, 2015," thus record 20F, "dated September 30, 2015" could not be considered. (Tr. 2).

Exhibit 20F was produced by physical therapist Kara Miller of Physical Therapy Neuro HC. (Tr. 635). While the "visit information" portion of this record shows that Fason was treated on August 18, 2015, not the thirteenth of that month (as Fason asserts) or the 30th of September (as the Appeals Council asserts), this appears to be the only record which fits Fason's description. (*Id*.).

Fason does not allege that she provided this record to the ALJ in a timely fashion, thus it is impossible to determine whether the ALJ had the record before her. Even if the ALJ did have the record in hand, she would not have been required to reference that record specifically for her decision to be supported by substantial evidence. *See Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004). Even assuming that the ALJ could and should have considered this piece of evidence, it is quite clear that the record could not have changed the ALJ's decision. Record 20F shows only that Fason was treated for "[m]uscle weakness (generalized)," and contains a "[p]roblem [l]ist" which includes menorrhagia, abnormal gynecological finding, uterine leiomyoma, Susac's Syndrome, lactose intolerance, anemia, and dizziness. (Tr. 635). The record contains no details regarding how Fason was treated, whether her conditions were improving or worsening, or any other detail which would be useful in assessing her level of functional capacity. Moreover, the record includes no ailment not present in the other

28

records. It is well established that an ALJ's failure to consider even a physician's opinion, a supremely useful piece of information when evaluating a person's residual functional capacity, may be harmless where the "treating source's opinion is so patently deficient that the Commissioner could not possibly credit it." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009) (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). In this case, the ALJ's failure to consider a non-descriptive record produced by a physical therapist is, at worst, harmless error.

### iv. The ALJ Adequately Addressed Fason's Visual Disturbances and Headaches

Fason also argues that the ALJ insufficiently compensated for her visual disturbances and headaches. (Doc. 20 at 3). She references records from Dr. Menkes in January 2015 that she suffered from acute visual disturbance in the left eye. (*Id.*). She also references her own complaints of visual disturbance. (Doc. 22 at 3). Yet Plaintiff's medical records paint a picture of relatively minimal eye limitation. Despite complaints of blurred vision in July 2014, her vision was intact, and her cortical and cranial nerves were normal. (Doc. 439). In September 2014 Fason complained of blurred vision; Dr. Ghaffarloo made note of a pituitary mass and referred Fason to a neurosurgeon. (Tr. 429). In October 2014 Dr. Nies noted intact vision and nerve function. (Tr. 446). In November 2014 Fason's pituitary tumor was noted to be "benign" and not warranting "any further imaging followup or workup." (Tr. 485). In January 2015 Fason's vision and nerves were

29

again found to be intact. (Tr. 451-52). In August 2015 Dr. Montasir found that Fason's vision was stable with glasses, and her nerve function was normal. (Tr. 621-22).

This is not to understate Fason's headaches and migraines, which she reported fairly consistently throughout 2014. (Tr. 205, 208, 249, 302, 317, 321, 331, 339-400, 437, 429, 444, 447). However, in January 2015 Fason reported that her headaches were "better" despite not having seen a rehabilitation specialist. (Tr. 449). Later that month she again reported headaches. (Tr. 456). In March 2015 she asserted that she was wheelchair bound due to headaches and left-side weakness. (Tr. 596). In June 2015, Fason told Dr. Robertson that her migraines were "controlled" by medication. (Tr. 612). It is also notable that Dr. Nies repeatedly found that there "may also be a component of psychosomatic influence" to Fason's ailments, including migraines, because "extensive normal testing" including MRI/MRV brain, MRI cervical spine, and spinal taps had been "unrevealing." (Tr. 440).

Fason has failed to demonstrate that she suffers any limitations as the result of her headaches and eye ailments beyond that accounted for in the ALJ's RFC finding. No physician in the record asserted that Fason would be disabled from work due to her headaches or vision problems. Finally, the record demonstrates that Fason's headaches have generally been controlled with the use of medication since early 2015.

### v.    The ALJ Adequately Addressed Fason's Diarrhea

Fason also asserts that the ALJ erred by insufficiently accounting for the limitations imposed by her diarrhea. (Doc. 20 at 3). Fason undoubtedly had treatment for

diarrhea in the medical record, including being admitted to the hospital for urgent treatment of diarrhea. (Tr. 410, 422). Yet by April 2015 Fason's diarrhea was controlled with medication (Tr. 603, 612), a finding which was repeated in the following months (Tr. 603). Fason has pointed to no evidence that her diarrhea, even when untreated, limited her functioning or reduced her ability to perform work. The ALJ was not obliged to account for any limitation resulting from diarrhea where Fason has not shown any such limitation.

### vi.   The ALJ Adequately Addressed Fason's Non-Severe Impairments

Fason complains in a general fashion that the ALJ should have concluded that her pain, weakness, visual disturbance, and diarrhea were severe impairments. Whether the ALJ listed these ailments as "severe" at Step Two of the sequential evaluation process is "legally irrelevant," because the ALJ complied with her obligation to consider all ailments, severe and non-severe, in the remaining steps of the analysis. *See McGlothin v. Comm'r of Soc. Sec.*, 299 F. App'x 516, 522 (6th Cir. 2008). Review of the ALJ's decision shows that she considered each of these non-severe ailments at specifically at Step Four. (Tr. 16-19). No error can be found here.

### vii.   The ALJ Did Not Err by Rephrasing the Medical Evidence

Fason also argues, again in a very general fashion, that the ALJ erred by rephrasing certain medical records, apparently to portray Fason as less disabled than she is in actuality. (Doc. 20 at 3-4). Fason attempts to demonstrate this by copying certain

quotes from the ALJ and comparing them to quotes in the medical record. However, precisely what she believes the ALJ misrepresented is still quite opaque. For instance, Fason asserts that the ALJ wrote "Michael Feldman, M.D., opined that the claimant was non ambulatory and needed to use a wheelchair," whereas the medical record states "Dr. Feldman stated that the Plaintiff requires a wheelchair." (*Id.* at 4). An ALJ is not required to cite medical records verbatim in order to establish that their decision is supported by substantial evidence. While ALJs are not free to mischaracterize evidence in the record, Fason has fallen well short of establishing that any such mischaracterization occurred here.

In short, Fason has not presented any argument meriting remand, and there are no obvious errors in the ALJ's decision which would necessitate remand. Fason purports to suffer from an extreme degree of limitation resulting from left-side weakness and other ailments, but the medical record reveals that many physicians questioned the sincerity of her complaints, and none confirmed a greater degree of limitation than that found by the ALJ. The ALJ's decision is supported by substantial evidence, and should be upheld.

### H.    Conclusion

For the reasons stated above, the Court **RECOMMENDS** that Fason's Motion for Summary Judgment (Doc. 20) be **DENIED**, the Commissioner's Motion (Doc. 21) be **GRANTED**, and that this case be **AFFIRMED**.

## III.    <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Caldwell v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection

33

No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections

are without merit, it may rule without awaiting the response.

Date:  March 17, 2017                           S/ PATRICIA T. MORRIS
                                                Patricia T. Morris
                                                United States Magistrate Judge


### CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date
through the Court's CM/ECF system which delivers a copy to all counsel of record.  A
copy was also sent via First Class Mail to Epha Fason at P.O. Box 7061, Dearborn, MI
48121.

Date: March 17, 2017                            By s/Kristen Castaneda
                                                Case Manager